UNITED STATES BANKRUPTCY COURT      **FOR PUBLICATION**

SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - x

In re:

                                     Chapter 7

DOUGLAS E. PALERMO,

                                      Case No. 05 B 25081 (ASH)

                     Debtor.

- - - - - - - - - - - - - - - - - - - - - - - - - - - x

DOUBET, LLC,

                     Plaintiff,

       -against -                             Adv. Proc. No. 06-8285A

DOUGLAS E. PALERMO,

                     Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - x

**A P P E A R A N C E S :**

**LOWENSTEIN SANDLER PC**
**Attorneys for Plaintiff**
**By: Bruce Buechler, Esq.**
      **Stefan B. Kalina, Esq.**
      **S. Jason Teele, Esq.**
**1251 Avenue of the Americas**
**18th Floor**
**New York, NY 10019**
**-and-**
**65 Livingston Avenue**
**Roseland, NJ 07068**

**COLE, SCHOTZ, MEISEL,**
   **FORMAN & LEONARD, P.A.**
**Attorneys for Debtor/Defendant**
**By: Laurence May, Esq.**
     **Nolan B. Shanahan, Esq.**
**900 Third Avenue**
**16th Floor**
**New York, NY 10022**

**ADLAI S. HARDIN, JR.**
**UNITED STATES BANKRUPTCY JUDGE**

**DECISION AFTER TRIAL**

This adversary proceeding was brought by judgment creditor Doubet, LLC ("Doubet") against debtor-defendant Douglas E. Palermo ("Palermo") seeking to deny Palermo's discharge under Sections 727(a)(2), (3) and (5) of the Bankruptcy Code, 11 U.S.C. §§ 727(a)(2), (3) and (5).    The case was tried to the Court without a jury.    The following constitute the Court's findings of fact and conclusions of law in accordance with Bankruptcy Rule 7052.    The Court has jurisdiction over this core proceeding under 28 U.S.C. §§ 1334(a) and 157(a) and (b), and the standing order of referral to Bankruptcy Judges signed by Acting Chief Judge Robert J. Ward on July 10, 1984.

For the reasons and upon the findings set forth below, I conclude that Palermo should be denied a discharge under subsections 2, 3 and 5 of Section 727(a).

**Background**

**I.      Doubet, Silver, and the State Court Judgments**

Doubet is an entity organized and controlled by Morris Silver ("Silver") for the benefit of his wife and children.  Silver is a certified public accountant and has practiced as such for decades either solo or in his own small accounting firm.  Silver served as an accountant for Palermo and certain of Palermo's business entities from time to time until 1990 and for one of his entities after 1990.  He also loaned money to Palermo on occasions before and after 1990.  Silver's testimony described the relationship solely as business and professional.    Palermo testified that he regarded Silver as a social friend and personal confidante, as well as an accountant and sometime lender.

In 1990 Silver filed three lawsuits against Palermo and others in the Supreme Court of the State of New York, County of Nassau, seeking to recover unpaid accounting fees and unpaid notes executed by Palermo.  Palermo did not defend any of the suits, and three default judgments (the "State Court Judgments") were entered in favor of Silver against Palermo: one dated September 13, 1990 in the amount of $72,752, the second judgment dated September 13, 1990 in the amount of $120,267 and the third judgment dated October 9, 1990 in the aggregate amount of $1,017,206.  On April 27, 1994, Palermo signed an affidavit acknowledging, *inter alia*, his debt on the October 9, 1990 judgment. Palermo also testified that by 1994 he was aware of the other two judgments.  Years later, in July or

August 2000, Silver assigned the State Court Judgments to his wife, who thereupon assigned the three

Judgments to Doubet.   Including statutory interest through the date of his bankruptcy filing, as calculated

by Silver, Palermo owed Silver $2,751,299 on the State Court Judgments.[1]

Except for the attachment of a relatively small bank account in 1992, there was no evidence at the trial before me that Silver or Doubet conducted any supplementary proceedings or made any effort to collect from Palermo on any of the State Court Judgments prior to 2003.   Notwithstanding the unpaid State Court Judgments aggregating over $1,210,000 (without interest), Silver made personal loans to Palermo on sixteen occasions between June 27, 1994 and April 4, 2001 aggregating $54,162.71, which was repaid in full with 10.47% interest for $91,403.06 on September 26, 2002, according to Silver's financial records.   After the default judgments, Silver continued to speak with Palermo hundreds of times. He also prepared a few tax returns for one of Palermo's entities after 1990.

## II.      Palermo and the Palermo Entities

Palermo describes himself as a 62-year old self-employed real estate consultant.   Since he left military service in 1970 he has provided various kinds of real estate consulting services, including identifying real property development sites for clients, procuring financing, identifying potential purchasers or joint venture partners and assisting in zoning changes.   In the late 1980s and in the early 1990s Palermo incurred considerable losses.   From 1990 until he filed his petition in 2005 Palermo has made "a very uneven living," with no income in some years and substantial earnings in others.   As evidence of this, his statement of financial affairs lists his 2003 income at $27,766, his 2004 income at $750,000 and nine months of 2005 income at $170,000.   During this period he frequently borrowed money from friends and business acquaintances.

On the evidence before me it must be concluded that Palermo was insolvent at all times since at least the State Court Judgments in 1990.   Palermo filed his voluntary petition under Chapter 7 on

---

[1]In its pleadings, Doubet admits to have collected $96,356.65, though it remains unclear whether that sum is to be deducted from the $2,751,299 or is attributable to Silver's personal loans to Palermo.   That designation does not affect the outcome of this adversary proceeding.

October 14, 2005.[2]  His asset schedules list no real estate and $5,000 of personal property.  Palermo also lists equity interests in four entities – Argus, Beekman, Brook Financial, and Norfolk, each discussed below – but he lists the value of each entity at $0.  His scheduled liabilities consisted of unsecured tax priority claims of $2,005,318 and unsecured nonpriority claims (including the State Court Judgments) aggregating $6,849,206.  Palermo testified that most of his liabilities date from his business reverses in the late 1980s and early 1990s.

It was Palermo's customary practice on certain occasions to conduct his business activities under the names of purported entities, or to funnel money which he earned to or through such entities, including the following:

> N.M. Palermo Inc., which was organized under the laws of the State of New Jersey on or about December 1927 by Palermo's grandfather.  N.M. Palermo's corporate charter was declared void by the State of New Jersey in May 1981.  Palermo has stated that he was never an equity shareholder of N.M. Palermo and never conducted business through N.M. Palermo;
>
> Beekman Street Advisory Corporation ("Beekman Street"), which was formed in 1986 and ceased to exist as a corporation in good standing in 1999.  Palermo was Beekman Street's sole shareholder;
>
> Argus Asset Management, LLC ("Argus"), which purportedly was formed in 2004 but ceased operations in 2005.   Palermo was the sole shareholder of Argus, which maintained a bank account;
>
> Norfolk Financial, LLC ("Norfolk"), which purportedly was formed sometime between 2003 and 2005.  Palermo was the sole shareholder of Norfolk, which maintained a bank account;
>
> Butterfield Trust I LLC ("Butterfield Trust"), which purportedly was formed by David Buchanan as managing member and sole shareholder between 2001-2002 to receive money earned by Palermo from the 455 Central Park West real estate project described below.   The management of Butterfield Trust was subsequently transferred to William Chipman, a friend, accountant and business associate of Palermo's.  Butterfield Trust had a bank account at Key Bank in Utah.  Chipman distributed funds received by Trust I LLC from the 455 Central Park West real estate project strictly in accordance with instructions given by Palermo;
>
> Brook Financial LLC, which was organized in or about 2005 by Palermo as sole owner; and

---

[2]    Neither Eric C. Kurtzman, the Chapter 7 Trustee, nor David R. Kittay, the successor Chapter 7 Trustee, has played any role in connection with this adversary proceeding.

Residual Equity Corp., which was organized under the laws of the State of Delaware as a corporation in December 2001. Buchanan was its sole owner. The corporation did not engage in any active business and was set up as a shell corporation to hold another entity. Residual Equity Corporation never had any assets nor active management and rendered no services in connection with the 455 Central Park West real estate project.

The foregoing are referred to collectively as the "Palermo Entities."

Despite document requests by Doubet's counsel in this adversary proceeding calling for production of all corporate records of all of the Palermo Entities, Palermo failed to produce any organization documents for any of the Palermo Entities. While copies of filing receipts and status revocations were provided for some entities, no by-laws, membership agreements or organizational documents were provided for any entities. Lacking documentary evidence that any of the Palermo Entities was in fact incorporated or otherwise organized in accordance with the laws of any state, I have no alternative but to conclude that none of the Palermo Entities actually existed as an entity, and that each was simply used as a "d/b/a" for Palermo himself in his business dealings, whether for tax purposes or otherwise. In any event, whether actually organized and existing or not, Palermo acknowledged in his testimony, and I find as a fact, that each of the Palermo Entities was subject to Palermo's sole control, and Palermo transferred or caused to be transferred property rights and funds to the Entities, between the Entities, and from the Entities to himself or to third parties at his sole discretion, instruction and control. As such, each of the Palermo Entities represented an alter ego of Palermo with no more independent identity than a bank account in Palermo's own name.[3]  As amplified below, these purported Entities were instrumental in Palermo's conduct on the basis of which his discharge is forfeited under Sections 727(a)(2), (3) and (5) of the Bankruptcy Code.

---

[3]     The findings in this paragraph apply equally to Butterfield Trust, of which Buchanan later replaced by Chipman was purportedly the owner or manager.

III.    **Palermo entitlements under the 455 CPW transaction prior to the Restraining Notices**

Doubet's claims in this adversary proceeding are based primarily but not exclusively on a series of real estate and lending transactions conducted by Palermo. It will be helpful to briefly summarize them.

In 1999 an auction was held to sell a parcel of property at 455 Central Park West in New York City. Palermo was part of a team consisting of Columbia University and Bovis Lendlease interested in bidding on the property for development purposes. Palermo's team submitted a bid which was unsuccessful. The MCL Companies of Chicago ("MCL") submitted the winning bid and MCL acquired the property in 1999. MCL created several entities for the purpose of purchasing and developing the property, including 455 CPW, LLC, which developed the property into two buildings comprised of residential condominium units.

The president and sole shareholder of MCL was Daniel McLean ("McLean"). William Scott ("Scott") was Deputy Vice President for Institutional Real Estate at Columbia University. Through his acquaintance with McLean and Scott, Palermo was instrumental in bringing about a transaction whereby Columbia University contracted to purchase 53 condominium units in the 455 Central Park West project (the "455 CPW closing"), with a "Put and Call" option for 455 CPW, LLC to sell Columbia an additional 24 condominium units. MCL agreed to pay Palermo a fee for introducing Columbia University to MCL as the buyer of the 53 proposed condominium units. Palermo designated two of his companies to receive his fee — Butterfield Trust and Beekman. Palermo's fee was the subject of two fee agreements.

The First Advisory Service Agreement (the "First Agreement") dated August 28, 2001 was between 455 CPW, LLC, and Butterfield Trust and Beekman as "exclusive financial advisors" in connection with the 455 CPW closing. In fact, all of the services for which compensation was to be paid out of the First Agreement were performed by Palermo personally. The total compensation "for services rendered" was $1,815,520, representing 4% of the purchase price of $45,388,000. The First Agreement provided that $453,880 of the fee was to be paid to Beekman upon granting of a construction loan; the remaining $1,361,640 was payable to Butterfield Trust upon the sales closing for the 53 condominium units. McLean negotiated and executed the First Agreement and dealt solely with Palermo in connection

- 6 -

with the Agreement.  Butterfield Trust did not exist as a corporate entity (if it ever existed as an entity)

when the First Agreement was executed.

The Second Advisory Services Agreement (the "Second Agreement") was executed on or

about January 29, 2002 between 455 CPW, LLC and N.M. Palermo.  The Second Agreement provided

that N.M. Palermo was to be paid a 1% fee, or $330,000 for arranging a loan through iStar, a source

introduced by Palermo to 455 CPW, LLC.  The Second Agreement was signed on behalf of N.M.

Palermo by Palermo and was payable when iStar financed the loan to 455 CPW, LLC (the "loan

closing").

Soon after signing these agreements, Palermo requested an advance on his commission.

McLean reluctantly agreed and authorized $140,000 in advances to Palermo personally in four $35,000

installments which were paid to Palermo on February 8, March 14, April 23, and June 3, 2002.[4]

On October 28, 2002, when the construction loan was due to close, Palermo threatened to

derail the project with lawsuits unless he could amend the payment schedules to obtain another cash ad-

vance.  The parties subsequently agreed to amend the fee services agreement.  In the Amended Advisory

Services Agreement (the "Amended Agreement"), it was acknowledged that (1) Palermo already received

an advance of $140,000 on his fees, (2) at the loan closing iStar, the lender, would advance to Palermo the

balance of Beekman Street's one percent commission, $313,880, which iStar could deduct from the loan

to 455 CPW, LLC, (3) $1,361,640 was still due Butterfield Trust upon closing of the sale, and (4)

Columbia University rather than 455 CPW, LLC would pay Palermo's balance at closing, which

Columbia could deduct from the purchase price it would pay 455 CPW, LLC.  Arranging for Columbia to

pay Palermo enabled him to receive funding directly from Columbia and thus before 455 CPW, LLC

received its proceeds and paid off its loan from iStar.  The Amended Agreement also added Residual

Equity Corp. entity as a signatory, though it did not appear on the original fee services agreement.

---

[4]Discrepancies later arose regarding which Palermo commission the advances corresponded to and which
Palermo entity the money was for.  McLean maintained that the accompanying cover letters produced on
discovery were doctored.  While these discrepancies are not outcome determinative, they are illustrative
of Palermo's lack of transparency in these dealings.

That same day, October 28, 2002, the parties agreed to Palermo's fee arrangement for the "Put and Call" agreement, even though Columbia never purchased the additional 24 units. This agreement seems to have superceded the Second Agreement, as it provides for the same approximate sum due Palermo, but changes the payor as well as the Palermo entity designated as payee. It recited that Palermo was due $120,000 from iStar at the impending loan closing, and he was due $203,176 from Columbia out of the purchase price at the 455 CPW closing. The loan closed two weeks later on November 12.[5]

## IV.    Palermo/Silver Contacts December 2002 to February 2003

In late 2002, Palermo renewed communications with Silver and arranged a meeting to discuss establishing trusts for Palermo's children. At Palermo's request the two met at Silver's Long Island office on December 16, 2002. At this meeting Palermo revealed to Silver his business activities and financial expectations with respect to the 455 Central Park West project, as well as an International Assets Holding Corporation ("IAHC") stock transaction and some foreign investments though Argus, but apparently with particular focus on the 455 Central Park West project. They did not discuss the River East or South Boston projects, discussed below, which Palermo testified "came much later" and "wasn't even a discussion." Palermo sought Silver's advice on diverting some or all of his financial entitlements under these projects to trusts for the benefit of his children. Palermo also asked Silver to act as trustee of the trusts for his children, Olivia and Grant. Palermo gave Silver proposed trust indentures for Silver's signature as trustee. Palermo and Silver differed in their testimony with respect to Silver's reaction to the request that he become a trustee for Palermo's children. Palermo testified that Silver agreed to serve as trustee; Silver testified that he never agreed to serve as trustee, and that he needed to refer the draft agreements to and consult with his personal attorney, which he did. There is no dispute that Silver never signed the proposed trust indentures and never became trustee for Palermo's children. There was no

---

[5]The evidence presented at trial is ambiguous as to whether and when Palermo received his payments due from iStar. The Amended Agreement provided that iStar would pay $313,880 to Beekman, Palermo's entity. The Put and Call Agreement provided that iStar would pay $120,000 to an entity designated by Palermo. Both would be payable at the November 12, 2002 loan closing. No evidence, testimony, or bank records indicated that Palermo ever had to demand these payments at a later date. Receipt of these particular payments does not have a material bearing on the outcome of this adversary proceeding.

evidence at the trial that trusts for Palermo's children were ever actually created or that any funds or other assets of Palermo were ever transferred to any Palermo trusts. (Butterfield Trust I LLC was not a trust, but a business entity, if it was an entity at all.)

There was no evidence that Silver gave any professional advice to Palermo with regard to tax avoidance or otherwise at or after the December 16 dinner meeting. Palermo and Silver did have one further dinner meeting in or about February 11, 2003 at the Wicked Wolf restaurant. There, they further discussed funding the trust under Palermo's future entitlements and leveraging the trusts to borrow funds against those future entitlements. They also discussed repayment of Palermo's judgment debts to Silver. Palermo offered a $250,000 assignment of his future entitlements, which Silver declined. **V. Silver's February 2003 Restraining Notices**

In February 2003, Silver served two sets of Restraining Notices on various parties to facilitate collection on the State Court Judgments from the fee income which Palermo was due to receive from his real estate activities. The First Restraining Notice dated February 19 was based upon Palermo's description of the fee due him in respect of 455 Central Park West. The First Restraining Notice was served upon Columbia University and its real estate officer Scott, MCL, McLean, 455 CPW, LLC, N.M. Palermo, Beekman Street Advisory, Butterfield Trust I LLC, David Buchanan, Butterfield Trust I Corp. c/o J. Landesman, J. Landesman c/o Sierra Financial, Ltd., two law firms and a bank. The Second Restraining Notice dated February 28 was served to prevent payment of fees arising from a Palermo stock transaction involving IAHC.[6] The Second Restraining Notice was served on various Palermo Entities, IAHC and various of its officers and a variety of third parties including IAHC's principal, John Hourihan ("Hourihan").

---

[6]The Second Restraining Notice was mistakenly dated February 28, 2002. This mistake did not affect the validity of the notice or the extensions subsequently issued.

On February 9, 2004 Doubet and Silver served a one-year extension of the First Restrain-ing Notice on the various parties. On September 27, 2005 the Supreme Court of the State of New York ordered a further one-year extension of the First Restraining Notice, which was also served on a variety of parties.

## VI.    Palermo's actions to evade the Restraining Notices

After being served with the First Restraining Notice that precluded payment of his fee on the 455 Central Park West project, Palermo arranged for several cash advances against his restrained fee from persons or entities not a party to the 455 Central Park West transaction and not covered by the Restraining Notices. Palermo thereby received funds prior to the closing of the 53 condominium units. In exchange, Palermo assigned to those persons and entities money due him from the 455 Central Park West transaction. Palermo also switched the payor of his commission a second time which enabled him to receive payment from the party willing to evade the Restraining Notices. As discussed below, each of those arrangements is a sufficient basis upon which to deny Palermo a discharge.

### A.    455 Central Park West

On July 15, 2003, Palermo arranged for a $120,000 cash advance from Brian Farley, on behalf of PMD company ("PMD"). Palermo assigned to PMD the right to collect the $203,176 "Put and Call" commission at the 455 CPW closing. On October 20, 2003, Palermo arranged a cash advance of an unidentified sum from his acquaintance and associate Joseph Korff ("Korff"). In exchange, Palermo assigned Korff $300,000 of his commission at the 455 CPW closing. On November 26, 2003, Palermo obtained a $60,000 cash advance from McLean. In exchange, he assigned McLean $70,000 of his commission at the 455 CPW closing.

On December 12, 2003, Silver and Hourihan settled litigation over the Second Restraining Notice relating to Palermo's entitlement to $100,000 from IAHC. Hourihan paid Doubet $75,000, which was applied to Doubet's judgments, and agreed not to transfer IAHC stock to Palermo. On December 29, 2003, Hourihan's entity, Doric Associates, Inc. wired $10,000 to Palermo's entity, Argus Asset Management.

On June 15, 2004, Palermo arranged a cash advance of an unidentified sum from Philip

Herlihy ("Herlihy") in exchange for an assignment to PMD of $90,000 of Palermo's commission at the

455 CPW closing.  On July 20, 2004, Palermo created Norfolk as a shell to hold the proceeds of the

impending closing.  As a new entity, it was not subject to the February 2003 Restraining Notices.

On July 29, 2004, Columbia closed its purchase of the 53 units from 455 CPW, LLC,

triggering the balance of Palermo's commission.  By this date, Palermo had received Beekman Street's

$453,880 apportionment: from February to June 2002, he received a $140,000 advance from McLean

and on or about November 12, 2002, he received a $313,880 advance from iStar.

As of the closing, Butterfield Trust was still entitled to $1,361,640 as well as the

$203,176 "Put and Call" commission, totaling $1,564,816.  At the closing, another amendment was

executed that named 455 CPW, LLC the payor of the commission, no longer Columbia.[7]  Palermo

orchestrated this because 455 CPW, LLC was willing to evade the Restraining Notices, as it already had

on November 26, 2003 with McLean's $60,000 advance to Palermo.  Columbia's attorneys, on the other

hand, expressed willingness to comply with the Restraining Notices, and leaving them as payor would

have jeopardized Palermo's ability to receive payment.  455 CPW, LLC is currently challenging the

validity of the Restraining Notices in State Court.

At the closing, Palermo's $1,564,816 was apportioned as follows: $901,640 to Butterfield Trust,

Palermo's entity; $300,000 to Joseph Korff as per his assignment; $293,176 to PMD as per its two

assignments; and $70,000 to MCL as per McLean's assignment.  In total, Palermo arranged $663,176 in

assignments.

**B.    Miscellaneous personal expenses**

Within three months, Palermo spent $893,000 of Butterfield Trust's $901,640 as follows:

on August 2, 2004, Palermo wired $60,000 to John Livingston to repay a loan for "living expenses," of

which no documentation was offered; on August 2, 2004, Palermo wired $25,000 to Thomas Zacharias

---

[7]This amendment was signed on behalf of Butterfield Trust by David Buchanan.  Buchanan testified that he did not know of or sign that document, nor several other related documents on which his purported signature appears.  Soon after the 455 CPW closing, Buchanan resigned and Palermo replaced him with William Chipman as signatory and manager of Butterfield Trust.  Palermo's testimony on these issues further eroded his own credibility with this Court.

for introducing Palermo to 455 CPW, LLC; on August 3, 2004, Palermo wired $60,000 to John

Livingston for consulting fees, of which no documentation was offered; on August 5, 2004, Palermo

wired $10,000 to his lawyer at McGuire Woods; between August and November 2004, Palermo wired

$26,500 to William Chipman ("Chipman"), Palermo's financial advisor and the new signatory of the

Butterfield Trust account; between August 2004 and January 2005, Palermo wired $749,500 to Norfolk

Financial, his entity.  Most, but not all of these funds were then drained within three months.  The period

one year prior to bankruptcy began on October 14, 2004.  On October 31, 2004, the Butterfield Trust

account reflected a balance of $8,530.  On November 30, 2004, the account had $2,530.  On January 31,

2005, the account had $1,030.  On April 15, 2005, Palermo made the last withdrawal to cover a $900 car

payment to Columbia Consulting, leaving a balance of $119.25.[8]  That and similar car payments stemmed

from Palermo's August 2004 arrangement with Chipman's company, Columbia Consulting, to lease a

Mercedes Benz for Palermo.  Another Chipman entity, Makau Corp., who did not employ Palermo's

services, provided Palermo's health insurance coverage.

   From the $749,500 in the Norfolk account, Palermo issued debit memos of $310,000 into

his personal account and transferred $150,000 to cover a variety of loans and back payments of rent.

Many of these alleged loan repayments were never documented by a note of any kind.  Palermo also

issued hundreds of checks from Norfolk and his other entities to "HA."  HA was Palermo's Korean dry

cleaner.  Palermo would write HA checks and HA would exchange them for cash.  Palermo also testified

that for two to three years, HA extended Palermo an "unofficial credit line" where HA would advance

Palermo funds and Palermo would later repay.  From his several entities, Palermo wrote checks totaling

$110,833 to his dry cleaner.  Palermo's bankruptcy schedules list $30 per month in dry cleaning ex-

penses.  In the three years before Palermo filed his bankruptcy petition, he wrote $74,292 in checks to

HA.  That includes $28,867 in checks from October 14, 2004 to October 14, 2005, the pre-petition year.

---

[8]Although Doubet stipulated in its Pretrial Order that the Butterfield Trust account was fully drained by
November 2004, I have to reject that stipulation because it is simply contradicted by the evidence.  The
bank statements in question were discovered only later upon searching through the 8000-page mess of
documents.  Palermo's poor financial organization and lack of transparency again highlight how such
errors could be made.

Palermo also wrote HA $36,540 in checks post-petition. Palermo did not record his cash receipts in any financial books, whether pre- or post-petition. He also did not list HA as a creditor on his schedules.

Palermo conducted similar arrangements with at least five other friends and associates. He would orchestrate these "money exchanges" by providing cash in exchange for certified or bank checks to cover loans, expenses, children's tuition, and Fairfield County Hunt Club membership fees. Such bank checks are untraceable because they do not indicate the source account or destination of the funds. Palermo did not list these lenders as creditors on his bankruptcy schedules.

### C.     River East transaction in Chicago

River East is a shopping center development in Chicago owned by McLean through one of his MCL entities. In 2005 Palermo found Intercontinental Fund III ("IF3") as a buyer for the retail space in River East. Palermo was entitled to be paid a $437,000 commission for this introduction, as memorialized in a letter agreement between the MCL Companies and Norfolk Financial dated August 29, 2005. Palermo filed for bankruptcy on October 15, 2005. The sale closed on January 17, 2006, whereupon 455 CPW, LLC paid a $340,200 fee to Norfolk Financial. Palermo's entitlement to receive the $437,000 fee was not reported in his bankruptcy schedules. After assigning $96,800 to other parties, Palermo received $340,200 of his fee from the River East transaction which he reported as personal income for 2006, not for 2005. He also admits he did not tell the Chapter 7 trustee that he received this alleged post-petition money.

Palermo asserted at trial that the fee represented 2006 income because IF3 backed out of the transaction in early January 2006 and only proceeded to close on the transaction as a result of further negotiation and work by Palermo. However, there is no evidence or documentation to support this assertion, and Palermo's wire instructions letter to Daniel McLean dated January 5, 2006 requests his fee "[p]ursuant to our consulting agreement dated August 29, 2005." Many deals involve pre-closing difficulties; the transaction was the same.[9] The money was earned in 2005, pre-petition, as per the January 5 letter, the only evidence of the transaction. In his January 5 letter, Palermo also arranged for

---

[9]As above, I must reject Doubet's stipulation in the Pretrial Order to a "termination" because it is contradicted by the evidence. The only evidence of this transaction was Palermo's letter, linking the transaction from August 2005 to January 2006 and negating any claim of a termination.

McLean to distribute the balance of his $437,000 fee as follows: he arranged for $71,800 to be wired to Herlihy in repayment of a $59,000 loan and he instructed MCL to retain $25,000 in repayment of a $16,000 cash advance from December 23, 2005, less than a month earlier. That brief loan earned 62.5% interest.

      **D.**    **South Boston Development Project**

      Palermo originally owned 100% of Brook Financial, which fully owned South Boston Housing Enhancement, LLC ("South Boston"). One of McLean's entities acquired 80% of the interest in South Boston from Palermo, and McLean is now its developer. McLean paid Palermo $170,000 for Palermo's "expenses" and $322,895 for the 80% interest. Through Brook Financial, Palermo still holds 20% of the partners' general interest, equivalent to 4%. This interest is not reflected in Palermo's schedules.

      From August 5 to October 27, 2005, McLean entities made eleven payments to Palermo entities, totaling $322,895. One of those payments was on October 6, 2005, in which Old Town Development, LLC a McLean entity, advanced $100,000 to Palermo. On October 7, Palermo paid that $100,000 from the Norfolk bank account to his wife, one week prior to their October 13 Separation Agreement. According to the Separation Agreement, Palermo was to pay $1,200,000 to his ex-wife over ten years. $100,000 was due upon signing and delivering the Separation Agreement, a second $100,000 was due on April 4, 2006, and then $100,000 was due every six months for five years. Since then, Palermo paid $34,477 to his ex-wife on January 18, 2006 and $25,000 to her on August 4, 2006. The only payment he made in full was the week before filing his petition. On October 14, 2005, Palermo filed for bankruptcy relief under Chapter 7. On October 27, River East Plaza, LLC, a McLean entity, paid $7,895 to Kevin Collins, Esq., Palermo's divorce counsel. Collins is not listed as a creditor on Palermo's bankruptcy schedules.

      Palermo introduced McLean to XE Capital ("XE") to form a $50,000,000 fund for real estate investment, including investment in the South Boston property. On August 2, 2006, Palermo earned a 2% fee, or approximately $500,000 upon making this introduction. Palermo assigned $104,000 to Herlihy for repayment of an undisclosed cash advance. Palermo also assigned $22,895 to McLean for repayment of an undisclosed cash advance. Of the $500,000 owed to him, Palermo received $376,105.

Palermo does not claim to have disclosed the South Boston or Chicago development projects to Silver in their meetings from December 2002 to February 2003.

**Discussion**

I.    **Governing Law**

Section 727 of Title 11 outlines exceptions to a Chapter 7 discharge.  Courts construe such exceptions strictly against the objector and liberally in the debtor's favor.  *In re Klutchko*, 338 B.R. 554, 567 (Bankr. S.D.N.Y. 2005).  Nonetheless, exceptions to discharge under Sections (2), (3), and (5) are each applicable in this case.

A.    **Section 727(a)(2)**

Section 727(a)(2) precludes a discharge if the debtor (1) with intent to hinder, delay, or defraud a creditor (2) transfers, removes, destroys, mutilates, or conceals, or has permitted to be transferred, removed, destroyed, mutilated, or concealed, (3) property of the debtor (4) within one year of the petition date.  *See In re Wong,* 291 B.R. 266, 282 (Bankr. S.D.N.Y. 2003).  "Fraudulent intent may be established by circumstantial evidence or by inferences drawn from a course of conduct." *Id.* (quoting *Glaser v. Glaser* (*In re Glaser*), 49 B.R. 1015, 1019 (Bankr. S.D.N.Y. 1985)).  These circumstances can be drawn from several badges of fraud, including:

(1)  the lack or inadequacy of consideration;

(2)  the family, friendship or close associate relationship between the parties;

(3)  the retention of possession, benefit or use of the property in question;

(4)  the financial condition of the party sought to be charged both before and after the transaction;

(5)  the existence or cumulative effect of a pattern or series of transactions or course of conduct after the incurring of debt, onset of financial difficulties, or pendency or threat of suits by creditors; and

(6)  the general chronology of the events and transactions under inquiry.

*See Nate B. & Francis Spingold Foundation, Inc. v. Halperin* (*In re Halperin*), 215 B.R. 321, 329 (Bankr. E.D.N.Y. 1997) (citing *Salomon v. Kaiser* (*In re Kaiser*), 722 F.2d 1574, 1582-83 (2d Cir. 1983)).

The one-year requirement can be extended under the Continuing Concealment Doctrine (the "Doctrine").  The Doctrine loosens the one-year requirement by precluding a discharge when the acts

constituting the debtor's fraud began before the one-year period prior to the petition date and continued

into that time period.  The fraudulent act can extend into the pre-petition year even if the debtor merely

allowed the property to remain concealed during that critical year.  *See Rosen v. Benzer*, 996 F.2d 1527,

1531 (3d Cir. 1993) (holding that a mere "failure to reveal" hidden assets can invoke the Doctrine, even

without any other act in the pre-petition year).  A typical Continuing Concealment claim involves "(1) the

transfer of property by a debtor who still retains a beneficial interest or equitable interest in the property;

and (2) the debtor's continuing to treat the property in the same manner after the transfer as before the

transfer."  *Bank of Chester County v. Cohen*, 142 B.R. 720, 726 (E.D.Pa. 1992).

**B.**    <u>Section 727(a)(3)</u>

Section 727(a)(3) permits the court to deny the debtor a discharge if the plaintiff proves

that the debtor has "concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded

information, including books, documents, records, and papers, from which the debtor's financial condi-

tion or business transactions might be ascertained." 11 U.S.C. § 727(a)(3).  To prevail under section

727(a)(3), an objecting creditor must prove that the debtor (1) failed to keep and maintain adequate books

and records and that (2) such failure makes it impossible to discern the debtor's true financial condition

and to identify material transactions.  *See In re Jacobowitz,* 309 B.R. 429, 436 (Bankr. S.D.N.Y. 2004).

The purpose of Section 727(a)(3) is to provide creditors and the court with "complete and

accurate information concerning the status of the debtor's affairs and to test the completeness of the

disclosure requirement to a discharge." *Nof v. Gannon* (*In re Gannon*), 173 B.R. 313, 321 (Bankr.

S.D.N.Y. 1994) (quoting *Meridian Bank v. Alten*, 958 F.2d 1226, 1230 (3d Cir. 1992)).  As such, "the

purpose of section 727(a)(3) is not record-keeping for its own sake," *In re Sethi*, 250 B.R. 831, 838

(Bankr. E.D.N.Y. 2000), but rather "to trace the debtor's financial history, to ascertain the debtor's

financial condition, and to reconstruct the debtor's business transactions."  *In re Goldstein*, 123 B.R. 514,

522 (Bankr. E.D. Pa. 1991).  While the adequacy of documentation depends on the circumstances,

complete disclosure is required in every case.  *In re Underhill*, 82 F.2d 258, 259 (2d Cir. 1936).

Courts have considered several factors in determining whether the circumstances of a

case warrant a denial of discharge under 727(a)(3), including:

(1)  the complexity and volume of the business;

(2) the amount of the debtor's obligations;

(3) whether the failure to keep records was the debtor's fault;

(4) the debtor's business experience and sophistication;

(5) the customary business practices for record keeping in the debtor's type of business;

(6) the degree of accuracy disclosed by the debtor's existing books and records; and

(7) the extent of any egregious conduct on the debtor's part.

*In re Frommann*, 153 B.R. 113, 117 (Bankr. E.D.N.Y. 1993). Intent to defraud is not an element of Section 727(a)(3). *See In re Kressner*, 206 B.R. 303, 315-16 (Bankr. S.D.N.Y. 1997) (citing *In re Potter*, 88 B.R. 843, 848 (Bankr. N.D. Ill. 1988)).

    **C.**    <u>Section 727(a)(5)</u>

        Section 727(a)(5) precludes a discharge if the debtor fails to satisfactorily explain any losses or deficiencies in his assets. The purpose of Section 727(a)(5) is to prevent the abuse of the bankruptcy process by the debtor "obfuscating the true nature of [the debtor's] affairs, and then refusing to provide a credible explanation." *In re Johnson*, 98 B.R. 359, 366 (Bankr. N.D.Ill. 1988) (quoting *In re Martin*, 698 F.2d 883, 888 (7th Cir. 1983)). If the debtor can account for all assets, the explanation does not have to be praiseworthy. *See Nate B. and Francis Spingold Foundation, Inc. v. Halperin* (*In re Halperin*), 215 B.R. 321, 333. Similarly, irresponsible spending itself is not a failure to explain, as long as the debtor can indicate where the assets were spent. *See Continental Illinois Nat'l Bank and Trust Co. of Chicago v. Bernard* (*In re Bernard*), 99 B.R. 563, 571 (Bankr. S.D.N.Y. 1989) ("[t]hat the debtor did not tighten his belt in the face of a financial downturn does not mean that the debtor failed to explain where his annual income went."). On the other hand, the debtor must offer "much more in the way of explanation than vague generalities." *In re Sperling*, 72 F.2d 259, 261 (2d Cir. 1934).

**II.**    <u>Grounds for Denial of Discharge</u>

    **A.**    <u>Denial of Discharge under Section 727(a)(2)</u>

        Given the activities of Palermo, there can be no doubt that he met the statutory exception to discharge: he (1) intended to hinder his creditors by (2) transferring and concealing (3) his property (4) into the pre-petition year. By orchestrating complex fee arrangements between his various alter ego

entities, Palermo acted with the requisite intent to hinder creditors by taking cash advances on his future earnings, assigning his payments to those lenders in repayment, transferring his property between accounts, and squandering the balances. The fees, as consideration for his real estate brokering, were his property. The one-year requirement is satisfied by the Doctrine, as discussed below.

        1.      **Discerning Palermo's intent**

        Palermo's intent may be established by circumstantial evidence. *See In re Wong,* 291 B.R. 266, 282 (Bankr. S.D.N.Y. 2003). Ever since the 1990 default judgments against him, Palermo was personally insolvent and had a substantial interest in siphoning off his money to his various shell entities. He did so in the 2001 fee agreement by dividing his $1,815,520 commission between two entities, designating the loan commission to a third, and spending the majority of the funds after a transfer to a fourth. In 2002, Palermo added new entities to the Amended Agreement which enabled him to further conceal his funds between and within his various entities. In 2003, he took a $120,000 cash advance from Brian Farley to be repaid out of his commission. He did the same with Joseph Korff, Daniel McLean, and Philip Herlihy for various amounts. By taking these loans early and assigning the rights to payment, Palermo could funnel off the money he earned while not reporting it as income or subjecting it to the reach of his creditors. In total, Palermo assigned $663,176 of his commission, or over a third of the money due to him.

        Palermo then used his alter egos to pay off other loans, transfer money to his other accounts, and eventually squander the funds altogether. Other checks that were made out to Palermo himself would be deposited into his shell accounts, again keeping the money from his creditors. Each transaction constitutes a transfer of property sufficient to deny Palermo a discharge.

        Not only did Palermo orchestrate complex deals to evade his creditors, he did so at a great expense to himself. The Farley cash advance cost Palermo over $83,000. The November 2003 McLean advance cost Palermo $10,000. The December 2005 McLean advance cost Palermo $9,000, or 62.5% interest, and the fees were only forwarded one month in advance. He also paid Phillip Herlihy $71,800 for a $59,000 loan, this loan was at 17.8%. There is no explanation for these costly transactions

other than to divert money from his creditors (principally Silver and his restraining notices), and possibly tax fraud.

Thus, Palermo has affixed the badges of fraud. (1) Consideration: the lack of consideration for these outlandish interest rates is self-evident. Palermo needed the money immediately and was willing to pay the price, so long as the transaction would be funneled through his alter egos. (2) Close relationship: each lender was a friend or close associate who was willing to accommodate Palermo's request for advancing funds pursuant to his trafficking schemes. (3) Retaining use of property: Palermo retained possession, benefit and use of the funds. He was in sole control of these accounts. He took the cash advance, paid for his personal expenses, and assigned the future right to payment. It was all under his control. (4) Cumulative effect: the pattern of these transactions clearly indicates fraudulent activity. Palermo kept the money out of his name while arranging for millions of dollars in cash advances, from multiple sources, to cover his expenses. (5) Chronology: while this pattern of behavior is evident since at least 2002, once Silver issued the restraining notices, the extent of the scheming intensified. Once Palermo's creditor indicated a threat of suit, Palermo took at least four loans for over a half million dollars in only ten months. He continued to have his expenses paid by others and allowed them to take his future entitlements. These circumstances establish the requisite intent.

## 2.    Applying the Continuing Concealment Doctrine

Doubet persuasively argues that the Doctrine applies because Palermo's transfers began before the pre-petition year, commencing October 14, 2004, and continued into the critical year. Before the critical year, Palermo assigned valuable rights to receive payment to Farley, Korff, McLean, and Herlihy for amounts totaling at least $663,176. Additionally, in this time period, Palermo leased a Mercedes Benz and obtained health insurance through Chipman, obtained an unofficial credit line and cashed thousands of dollars in checks with HA, performed money exchanges with friends, received investment reimbursements from Hourihan, and siphoned off proceeds from the 455 CPW closing in a series of inter-entity transfers.

In the pre-petition year itself, Palermo continued these activities by cashing checks with HA from his various entities, taking advances from McLean and Herlihy against entitlements in the South

Boston and River East transactions, and using his various entities to pay hundreds of thousands of dollars in personal expenses – tuition, social clubs, and his divorce settlement – from the funds he received through these cash advance and transfer schemes. Palermo thus met the Doctrine's requirements: he (1) transferred to third parties his future entitlements, thus hiding them from his creditors, and (2) treated the cash advances as his own by arranging for his personal expenses to be covered, all the while not reporting it as personal income.

Palermo asserts four unpersuasive arguments. First, that under the Doctrine, the debtor's retained interest was not sufficiently secretive, citing *Nate B. & Francis Spingold Foundation, Inc. v. Halperin* (*In re Halperin*), 215 B.R. 321, 331 (Bankr. E.D.N.Y. 1997). However, the basic foundation of the Doctrine is a transfer of funds while retaining beneficial ownership. In *In re Halperin*, the debtor only obtained a discharge because she retained no interest in the transferred funds. *See id.* at 331. In this case, the money was all Palermo's. Money was owed to him for his introductions and consulting services. By assigning away his rights to each payment, he transferred away the actual funds, while concealing the benefits he received in the cash advances. Since Palermo retained the beneficial ownership, the entire thrust of the transfer was secretive in nature. The secretive prong of the Doctrine seeks to prevent a debtor from "represent[ing] to the world that the debtor has transferred away all his interest in the property while in reality he has retained some secret interest." *Rosen v. Bezner*, 996 F.2d 1527, 1532 (3d Cir. 1993). Palermo's entire purpose in altering the fee arrangements from his name to his corporate entity, then not reporting them on his tax returns, all the while controlling the funds, accomplished just that. It represented to the world that he no longer had a beneficial interest in the funds, when in fact he did. Certainly hiding assets from one's tax return is a secret interest. Palermo alternated between requesting checks to himself and his entities. He demanded amended agreements to avoid the restraining notices and hide behind his alter egos. His *modus operandi* was secretive; he operated a complex web in the hopes of getting cash advances, arranging for his obligors to pay third parties, all the while avoiding his other creditors.

Palermo argues that disclosing the transactions in December 2002 to Silver uncovered the concealment and indicates a lack of intent to hinder or delay creditors. However, Palermo's assertion is

fundamentally flawed.  Whatever Palermo's intent might have been in December 2002 only speaks to his intent up to that point.  It does not and cannot speak to Palermo's intent in July, October, or November 2003, and certainly not July 2004, the various dates when Palermo took the cash advances and assigned his future entitlements.  His intent from the December 2002 meeting is irrelevant.  The subsequent assignments and loans constitute the transfers in question.  While receipt of the funds was not a secret to Silver, certainly the subsequent loan scheme was.  Palermo did not disclose the subterfuge he used to assign away his rights to payment.  Palermo did not disclose the underhanded tactics he used to take possession of the funds despite the Restraining Notices.  Palermo's intent in disclosing his deals to Silver in 2002 is irrelevant in light of his subsequent intent to evade Silver through these loan schemes.

Palermo's related assertion is similarly unconvincing.  Palermo claims that the $901,640 he received from the 455 CPW closing was not concealed because it was transferred into his own entity, as opposed to an entity beyond his control.  This argument fails in two respects.  First, it does not account for the remaining $663,176 in assignments that Palermo did assign to third parties beyond his control, and are thus concealed as per the Doctrine.  Second, the $901,640 itself was a transfer beyond the reach of Silver as Palermo's creditor.  *See Marine Midland Bank v. Portnoy* (*In re Portnoy*), 201 B.R. 685, 694-95 (Bankr. S.D.N.Y. 1996) (noting "[c]oncealment of property is also evidenced by the debtor's 'placing assets beyond the reach of creditors...'" (citations omitted)).  The funds were siphoned into the Butterfield Trust account of which Palermo had control but was not a named manager.  Creditors still could not reach Butterfield Trust because Chipman was the named managing member.  Therefore, while the funds were subject to Palermo's control, they were not in his name, and thus were concealed from creditors.   Any other result would allow a debtor to circumvent the Doctrine simply by disclosing funds to a creditor, all the while keeping those same funds beyond the creditor's actual reach.  Palermo's eventual transfer of funds into his Norfolk account was equally useless to his creditors since he inexplicably wasted it all within a matter of months, as discussed below.

Additionally, Palermo only disclosed certain deals to Silver.  Other transactions, such as the River East and South Boston projects were not disclosed, and certainly were concealed from Silver. In those transactions, the requisite intent is indisputably manifest.

Finally, Palermo cannot manipulate the legal system to evade his creditors. After the restraining notices were issued in February 2003, Palermo attempted to vacate the 1990 judgments in New York State Court. Only after Palermo lost his motion to vacate the judgments against him did he file for bankruptcy. These prolonged litigation efforts extended for nearly three years during which Silver had to extend the Restraining Notices twice. Palermo cannot use prolonged litigation that he initiated in order to evade a one-year statute of limitations.

Palermo's second unpersuasive argument is that the property interest must be direct, and that a mere derivative interest in the property is insufficient, citing *Citik Ka Wah Bank, Ltd. v. Wong* (*In re Wong*), 291 B.R. 266, 282 (Bankr. S.D.N.Y. 2003). However, *In re Wong* involved a debtor transferring assets of a non-bankrupt corporation of which the debtor was a principal, thus distinguishing corporate assets from the debtor-principal's individual assets. *Id.* In this case, Palermo admits that the Palermo entities contain only Palermo's money. The shell entities are all the equivalent of Palermo's bank account, and the money owed to him by agreement with 455 CPW, LLC is his direct interest.

Third, Palermo argues that the transfer itself was not performed by the debtor, citing *Nate B. & Francis Spingold Foundation, Inc. v. Halperin* (*In re Halperin*), 215 B.R. 321, 332–33 (Bankr. E.D.N.Y. 1997) (holding that where the debtor did not act but merely had knowledge of and benefit from the fraudulent transfer, he was not considered to have performed it). However, since the fee amendment schemes were orchestrated by Palermo to evade the restraining notice, he in fact arranged the transfers. He certainly permitted them to occur, which satisfies the statutory language of Section 727(a)(2). *See In re Wong*, 291 B.R. 266, 282 (Bankr. S.D.N.Y. 2003). He changed the payor from 455 CPW, LLC to Columbia, then back to 455 CPW, LLC. He requested some checks under his name and others as Butterfield Trust. He assigned the proceeds to third parties to payoff his many cash advances. He orchestrated the entire operation.

Fourth, Palermo argues that intent to hinder was not exhibited within the pre-petition year which is needed to retroactively link the concealment from before the pre-petition year, citing *In re Portnoy*, 201 B.R. at 701. However, since Palermo continued to traffic these finances through his various entities while not reporting them as his own income, his intent to keep assets from his creditors continued

throughout the requisite period, thus invoking the Doctrine.  Palermo's Butterfield Trust account

statements, where he received $901,640 from 455 CPW, LLC, indicate that he possessed and was

spending this money into April 2005, within the pre-petition year.  Since Palermo was still spending his

fee income from the 455 CPW closing within the pre-petition year, his concealment efforts continued into

the critical year.  He obtained loans from his friends and associates in the pre-petition year.  He laundered

$28,867 of checks through his dry cleaner in the critical year.  He transferred $1,500 from Butterfield

Trust to Norfolk in January 2005, within the critical year.  He made car payments to Chipman through his

Norfolk account in the critical year.  He arranged his River East commission during the critical year.  He

sold of 80% of his ownership of South Boston in the critical year.  He had Norfolk pay his $100,000

divorce payment out of the South Boston proceeds in the critical year.  The Doctrine of Continuing

Concealment tolls Palermo's activities from before the one-year time period into that period, and his

transfers delayed, hindered, and defrauded his creditors, precluding discharge.

It is important to note that with regard to River East, Palermo's story does not save

himself.  His claim that IF3 backed out, even if it were true, only alleges that IF3 backed out in January

2006.  That means that as of Palermo's petition date, October 14, 2005, his interest in the commission was

still an asset that he did not report on his bankruptcy schedules.  That omission alone is sufficient grounds

on which to deny Palermo a discharge, in addition to the many grounds articulated in this section and

below.

**B.**      **Denial of Discharge under Section 727(a)(3)**

Palermo's discharge is further denied because he concealed information and failed to

preserve records from which his financial condition and business transactions could be ascertained.  11

U.S.C. § 723(a)(3).  Palermo did not maintain records of his financial transactions, and his accountings

are fraught with inaccuracies and inconsistencies.  The Quicken financial program he supplied was

woefully deficient.  The vast majority of information relating to his concealment was obtained from third

parties in the form of copied source documents, many of which were incomplete, hand-written, and

illegible.  This haphazard 8,000-page mess left one unable to fully uncover and reconstruct the extent of

assets concealed by Palermo or the channels through which funds were funneled from one account to the next.

The *Frommann* factors weigh heavily against discharge. (1) Complexity and volume: Palermo's business involved complex deals in various lucrative real estate transactions with sophisticated commission schedules. (2) Amount of obligation: Palermo's $2,751,299 obligation to Silver is substantial, especially in light of his $5,000 in disclosed assets. (3) Fault: while Silver was Palermo's accountant for various matters, the broad entity-funneling network was controlled only by Palermo, and his failure to keep records is attributable to him only, since only he could understand the extent of his alter egos. (4) Experience and sophistication: Palermo schemed to create and manipulate the Palermo Entities, and at minimum he is experienced enough to keep track of the money he transferred from one to another. (5) Accuracy: Palermo's financial records were fraught with duplications, omissions, and ambiguities.

Palermo's entire financial world depends on murkiness. He borrows money at 62.5% interest. He relies on an unofficial credit line from his dry cleaner. His financial advisor leases his car for him through one company and pays his health insurance through another. He makes money exchanges through untraceable certified and bank checks. He divides fees between different corporate entities which do not actually exist or hold bank accounts. He testified that he relies on memory to identify whether a particular deposit was from a particular source. He arranges for others to pay his various country club and hunt club memberships. He paid his alimony from his corporate entities. He arranged for McLean to pay his divorce lawyer out of his commissions. His tax records and bankruptcy schedules contain dramatic misrepresentations of fact, which Palermo conceded. He admitted to providing fraudulent responses to interrogatories under the penalty of perjury. His financial affidavit from his divorce claims a weekly income vastly different from that on his bankruptcy schedules, filed one day apart. His books and records reflect $445,000 in uncategorized deposits and $522,000 in uncategorized withdrawals. The sources, destinations, and purposes of numerous transactions remain unclear.

One can only conclude that Palermo concealed assets to pay his and others' living expenses without leaving adequate records to ascertain his true financial condition.

In his Post-Trial Proposed Findings of Facts, Palermo cites *Cadlerock Joint Venture, LP v. Cacioli* (*In re Cacioli*), 285 B.R. 778, 782 (Bankr. D. Conn. 2002) to argue that under Section 727(a)(3), concealment involves a deliberate attempt to shield certain recorded information from detection and/or inspection. The facts here amply support such a finding, and I so find. But intent is not an element of Section 727(a)(3). *See In re Kressner*, 206 B.R. 303, 315–16 (Bankr. S.D.N.Y. 1997). Palermo's reliance on *In re Cromer* to distinguish between his personal record keeping and his corporate record keeping is entirely irrelevant, given the exclusive control and manipulation he holds over those corporate alter-egos, even if they ever existed. *See Krohn v. Cromer* (*In re Cromer*), 214 B.R. 86, 99 (Bankr. E.D.N.Y. 1997).

### C.    Denial of Discharge under Section 727(a)(5)

Palermo argues that he has demonstrated the manner in which funds were expended. Of course, it is undisputed that Palermo's spending was grossly irresponsible. In fact, his only defense is that he has a right to be irresponsible, as long as he explains in what way he was irresponsible. Since 2002, Palermo had the exclusive use of several Mercedes Benz automobiles, paid more than $131,000 to country clubs and at least another $100,000 to the Fairfield County Hunt Club from the accounts of entities which he controls, and paid almost $150,000 in school tuition for his children. Clearly, Palermo was living at a level far in excess of that expected of someone with only $5,000 of disclosed assets as set forth in his filed petition. His rent alone is $4,200 per month.

But the key finding under subsection (5) is that Palermo failed to maintain sufficient records or provide any meaningful explanation of how he received or spent more than one million dollars over the past three years. What is known is that he obtained substantial amounts of money in complicated ways from friends, associates, and entities that he controlled as a result of past and future real estate brokerage schemes. These funds would jump from one bank account to another and then quickly disappear altogether. His personal expenses, however, were always somehow covered.

Given the volume and extent of Palermo's expenditures, simply relying on canceled bank checks to spell out his financial world is insufficient to meet his obligation under Section 727(a)(5). Palermo received at least $1,700,000 in undocumented cash advances, representing at least thirty separate

transactions. The expenditure of those advances is unexplained. He spent at least $2,500,000 on personal expenses, the details of which are largely unexplained. The destination of his $110,833 from HA remains unexplained. The extent of his undocumented loans remains unexplained. The extent of his money exchanges from friends remains unexplained. The disappearance of over $600,000 from his Norfolk account remains unexplained. The leasing scheme of his Mercedes Benz remains unexplained. Palermo has obfuscated the true nature of his affairs and offered much more in the way of vague generalities than explanation. Palermo's finances are unaccounted for, and his discharge is denied.

**III.     Validity of the Restraining Notices**

Palermo claims that the restraining notices were improperly issued. However, regardless of the outcome of the pending state court litigation, Palermo's actions to evade his creditors remain the same. Even if the notices were invalid, Palermo still acted with intent to hinder, delay, and defraud his creditors. Regardless of the means by which Palermo knew of his creditor's efforts to collect, by siphoning the funds off to repay third party cash advances, Palermo's actions in hiding money from his creditors were sufficient to deny him a discharge.

**IV.     Claims of a Fiduciary Duty**

Palermo's claim that Silver breached a fiduciary duty as an accountant is entirely without merit. Neither federal nor New York law recognizes a privilege between accountants and their clients. *See United States v. Arthur Young & Co.*, 465 U.S. 805, 817 (1984); *First Interstate Credit Alliance, Inc. v. Arthur Anderson & Co.*, 150 A.D.2d 291, 292 (1st Dep't 1989). Further, at the time Palermo informed Silver of his intention to create trusts for his children, Silver was not acting as Palermo's accountant. Any claim of egregious malfeasance or resulting harm is entirely inappropriate since Silver was exercising his rights to enforce his own judgment.

Palermo claims that Silver also held fiduciary responsibilities as a trustee, claiming that Silver agreed to serve as trustee of Palermo's trusts. However, it is undisputed that Silver never signed any trust agreement. Moreover, Palermo's February 18, 2003 letter to Silver specifically instructs Silver not to act as trustee. It states "[y]ou have not accepted the offer [to become trustee] by sending Beekman a fully executed Assignment, therefore, Beekman hereby withdraws the offer of the Assignment." Further,

Palermo knew of the obvious conflict between Silver as trustee and as a creditor of those same funds. Palermo's claim that he did not know of the third debt to Silver is simply not credible, especially in light of his 1994 affidavit acknowledging that very debt to Silver.  At their February 11, 2003 dinner meeting, Palermo raised the issue of repaying his debts to Silver.  He knew Silver was his creditor.  Silver specifically told Palermo that he needed to show the trust documents to his lawyer, which Silver then did. The conflict was obvious.  Silver never agreed to be trustee, nor could he.

## Conclusion

For all the reasons explained above, Palermo's discharge is denied under Sections 727(a)(2), (3) and (5).  Counsel for Doubet is directed to submit an order consistent with this Decision.

Dated:  July 9, 2007
         White Plains, NY

/s/ Adlai S. Hardin, Jr.
ADLAI S. HARDIN, JR.
UNITED STATES BANKRUPTCY JUDGE